Turner, Appellant, vs. Learman, Respondent.

*April 12—May 31, 1913.*

*Alienation of wife's affections: Criminal conversation: Evidence:
Question for jury.*

In an action for alienation of a wife's affections and for criminal
conversation, the direction of a verdict in defendant's favor
was error, because different inferences could legitimately be
drawn from the evidence and the jury would have been war-
ranted in returning a verdict thereon for plaintiff.

Appeal from a judgment of the circuit court for Langlade
county: John Goodland, Circuit Judge. *Reversed.*

*H. F. Morson,* for the appellant.

For the respondent the cause was submitted on the brief of
*Albert H. Krugmeier.*

Barnes, J. This action was brought by the plaintiff
against the defendant to recover damages for alienation of
his wife's affections and for criminal conversation. The
court directed a verdict in defendant's favor, and from a·
judgment entered thereon the plaintiff appeals.

Direct proof of adultery is seldom obtainable. It must or-
dinarily be proven by circumstantial evidence. The jury
might legitimately believe the evidence of the plaintiff and
disbelieve that of the defendant, where there was a conflict.
If different inferences could be legitimately drawn from the
evidence, those most favorable to the plaintiff might be
drawn. If the inference of guilt might properly be drawn
from the whole evidence in the case, it presented a jury ques-
tion. It is only where there is an entire lack of credible evi-
dence that a court is warranted in taking a case from a jury.
These propositions are elementary and authorities need not
be cited to support them. The sole question in the case is
whether on the evidence adduced the jury would be justified

in returning a verdict for the plaintiff, bearing in mind the rule that the ruling of the circuit court in directing a verdict will not be set aside unless clearly wrong.

Archie Turner, the ten-year-old son of the plaintiff, testified that the defendant stayed at his father's house during the hunting season of 1910; that during that time his mother went to the root house and defendant followed her in a short time and went inside and shut the door; that he (the witness) went to the root house and tried to get in and they told him to go to the house; that in a little while he tried again to get in and they would not let him in the second time; that they were in the root house a good half hour and that the door was locked.  The plaintiff was away from home at the time.  The episode is not denied by the defendant, but he makes a plausible, and it may well be a truthful, explanation of it.  He says he was employed by plaintiff in the fall of 1910 and that he was directed by him to salt a deer and that this is what he was doing in the root house with plaintiff's wife.  He also said that the door was not locked and that Mrs. Turner told Archie when he tried to get in to go to the house and mind the baby.  There was a direct conflict in the testimony as to whether or not the door was locked, and the jury was at liberty to believe the boy if it saw fit.  If it was locked, that circumstance might not be conclusive of the defendant's guilt, but it would require a good deal of explanation which a jury might be slow to take at its face value, even where the door had a spring lock.

The boy further testified that when his father was gone the defendant would get him and his sister, who was younger than he, to go out and gather leaves and would give them a cent a sack for them and that he did not do this when plaintiff was home.  Also that when the father was gone defendant would be in the house a good deal with his mother, but it was otherwise when the father was home.

The plaintiff testified that prior to 1910 the defendant did

considerable hunting and trapping and stopped at plaintiff's house; that he employed defendant from January 10 to March 10, 1910, and that thereafter he hung around doing trapping and hunting until about Christmas; that Mrs. Turner left for New London to visit plaintiff's sister on December 22d for a stay of four days and did not come back until January 2d, at which time he went for her; that four days after his wife left the defendant also went away without saying where he was going; that he (plaintiff) found her at the home of defendant's father and mother and found the defendant there with her when he went to bring her home; that when he got there the defendant and his wife were in one room and the old folks were in another; that he told his wife he came to go home with her, and that she looked at defendant and said she did not know as she would go home at all; that he asked the defendant what he was tagging his wife around the country for, and he replied that that was no affair of plaintiff's; that he didn't have a shoestring tied to him and he had a right to go where he pleased; that his (plaintiff's) wife came home with him, but was determined that defendant should come also; that he (plaintiff) and his wife were in one rig and defendant in another as they drove to New London to catch the train and that she kept looking back continually and wanted to know if defendant was coming; that his wife requested him to see if defendant got on the train at New London, and when he did not she said she would return at once if he did not come on the next train; that on her homeward trip she said she would end their trouble when she got to a drug store; that when the train arrived at Antigo she insisted on their staying over to see if the defendant got on the train or not; that his wife insisted on his going to the train with her to meet defendant; that plaintiff and his wife then went to their home and defendant followed in a couple of days, when he was paid up and discharged; that he came to the house a couple of times afterward, but not on

plaintiff's invitation; that his wife did not seem to be the same after this; she would look out the way she saw defendant go, and cry; that when he asked her the reason, she would say: "You have raised h—l with *Will* [the defendant] and I don't care to live any more;" that Mrs. Turner left him in July, 1911, ostensibly to visit the plaintiff's sister, but instead went to the home of defendant's parents, near New London, and that at this time the defendant was in the vicinity of Kempster in Langlade county. On July 5th Mrs. Turner wrote a letter to a neighbor, Mrs. Vaughn, whose postoffice address was Kempster, in which she said, among other things:

"Did you see *Will* the day I left? Write back by return mail and let me know if he is at Kempster yet. You tell him there is somebody down here that wants him to come on the next train, and be *sure*. She told me to tell him, so you tell him for me. Say, Sadie, keep this letter out of sight of *Bert* and to yourself, because he gets madder than h—l when I write to any one. . . . Now answer right away and let me know about *Will*. His poor mother is so lonesome she cries for him. She says: If *Will* ain't at your place have Orves write to him or see him for her. Now, Sadie, keep still about this; the old man gave me h—l all the way to Antigo that day I left."

The inference might well be drawn from this letter that the "somebody" who was anxious to have *"Will"* take the next train was none other than the writer of the letter. Mrs. Vaughn showed the letter to the defendant the day she received it, and, while it may be a mere coincidence, he did leave on the next train and went to his father's home, where the plaintiff's wife was staying. He says he stayed but a short time, but he worked not far from there. The plaintiff further testified that in July he went to where his wife was staying to induce her to return, but that he did not succeed and he returned home the next day. He went to see her again in August and remained over night. He said his wife sent for the defendant and he came in the evening, and while he

was there she said, apparently addressing the defendant, "What will we do?" And in answer to her own question said, "We will stay and fight it." She again refused to return. At this time she had instituted an action for divorce. Defendant did not visit his parents in 1910 until Mrs. Turner went to their home, nor did he do so in 1911. Admittedly there was some correspondence between plaintiff's wife and the defendant. The plaintiff also testified that he found some postal cards in the pocket of a pair of trousers which defendant left at his place. There were some "mushy" verses printed thereon, but no satisfactory proof that Mrs. Turner sent or gave the cards to the defendant. Mrs. Turner was examined in reference to a second letter which she wrote to Mrs. Vaughn under date of July 24, 1911. It does not appear to be in the record, but it appears from the record that it contained the following statement: "God only knows which way he went and never expect to see him again." This referred to the defendant, and while he was not at his father's house where Mrs. Turner was staying when the letter was written, he was working in the immediate vicinity.

No one of these circumstances standing alone is very significant. This may be said generally in reference to the separate links in what may be a very satisfactory chain of circumstantial evidence. It may well be that the defendant is blameless. He may be the one pursued rather than the pursuer. If so, he did not try very hard to make his escape. Some of the evidence referred to is contradicted. Some of it is explained and some of it is difficult to explain. We do not care to comment on it at length or to emphasize any part of it. Inasmuch as a new trial must be had, comments might work prejudice. We do not point to any one item of evidence as making a case for the plaintiff. What we do hold is that the jury had the right to pass on the credibility of the evidence if conflicting inferences might reasonably be drawn therefrom, and that, taking the entire testimony offered, dif-

ferent inferences might be drawn and it was for the jury to draw the one which it deemed to be correct, and that it was fairly within its province to find the necessary facts to entitle the plaintiff to recover.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

SIEBECKER, KERWIN, and TIMLIN, JJ., dissent.